FRIENDS OF ANIMALS, INC. *v.* UNITED
ILLUMINATING COMPANY
(AC 30006)

Harper, Robinson and West, Js.

Argued November 20, 2009—officially released November 9, 2010

*Kathleen Eldergill*, with whom were *Danielle B. Omasta* and, on the brief, *Bruce S. Beck*, for the appellant (plaintiff).

*Jonathan M. Freiman*, with whom was *Robert J. Klee*, for the appellee (defendant).

*Opinion*

ROBINSON, J. In this equitable action, the plaintiff, Friends of Animals, Inc., sought a declaration and injunction restraining the defendant, United Illuminating Company, from gassing, killing or capturing monk parakeets (parakeets) that were nesting on power lines and electrical equipment. The plaintiff appeals from the judgment rendered by the trial court when it granted the defendant's motion to dismiss for failure to make out a prima facie case. On appeal, the plaintiff claims that the court (1) abused its discretion by (a) precluding from evidence excerpts from the deposition transcripts of three of the defendant's employees and the defendant's expert witness, (b) precluding the plaintiff from calling the defendant's expert witness as its own expert witness, (2) improperly granted the defendant's motion to dismiss for failure to make out a prima facie case and (3) improperly held that General Statutes § 26-92 (wild bird act) provides the applicable standard for unreasonableness under the Connecticut Environmental Protection Act of 1971 (act), General Statutes § 22a-14 et seq. We affirm the judgment of the trial court.

In its complaint, filed January 25, 2006, the plaintiff alleged, in part, that it is an international organization dedicated to the protection and preservation of wildlife. The defendant is a regional utility distributor, providing electricity to the greater New Haven and Bridgeport areas, and is responsible for maintaining electric lines,

poles, transformers, substations and other equipment necessary to provide electric power to its customers.

The plaintiff also alleged that the parakeets are pigeon-sized birds that build large communal nests of sticks and other vegetation on elevated sites that exist naturally, such as trees, and commercially, such as utility poles and lines. The parakeets have lived wild in Connecticut for thirty to forty years and are enmeshed in the state's ecosystem.[1] Moreover, the parakeets may increase the number and variety of wildlife in an otherwise ecologically barren urban environment, and they feed on undesirable species of weed plants.

The plaintiff further alleged that on or about November, 2005, the defendant destroyed parakeet nests on the power lines and utility poles it maintained in West Haven, Milford, Stratford and Bridgeport. The defendant claimed that the nests were a nuisance and a hazard. At the time in question, the plaintiff alleged that the defendant gassed the parakeets in the nests on utility lines and poles to capture and transfer them to be killed. Moreover, the defendant had failed to implement feasible and prudent methods of dissuading the parakeets from nesting on utility poles by routinely inspecting and maintaining equipment, removing prenesting structures or installing devices to prevent or dissuade parakeets from nesting on power equipment. In addition, the defendant's failure to implement measures to prevent the parakeets from nesting on utility poles and lines is likely to result in the parakeets continuing to build nests on utility poles, a potential public hazard, resulting in the defendant's lethal removal of

[1] The plaintiff alleged that the parakeets are enmeshed in the ecosystem because some other species of birds, including song sparrows, house finches and great horned owls, nest in the parakeets' nests and that the parakeets are part of the food chain because they are eaten by predatory birds such as hawks. Moreover, the plaintiff alleged, the parakeets are herbivores, and their presence has a benign effect on other local species.

the parakeets. Finally, the plaintiff alleged that "[t]he killing or removal of [parakeets] from the local ecosystem by the [d]efendant will, unless restrained, constitute conduct which is *reasonably likely to unreasonably impair or destroy the public trust in a natural resource of the state*, to wit, the [parakeets] and other interdependent local and indigenous species in violation of [General Statutes] § 22a-16[2] . . . ." (Emphasis added.)

In its prayer for relief, the plaintiff requested that the court declare the defendant's failure to implement routine maintenance and measures to prevent the parakeets from nesting on utility poles and its gassing, killing or capturing the parakeets a violation of § 22a-16. The plaintiff also sought a permanent injunction restraining the defendant from gassing, killing or capturing the parakeets, and requested reasonable costs, attorney's fees and other relief the court may deem just and proper.

The case was tried over three days in May, 2008. The plaintiff presented the testimony of its expert witness, Dwight G. Smith, professor and chair of the biology department at Southern Connecticut State University, Priscilla Feral, the plaintiff's president, and Donna Dwyer, a member and volunteer of the plaintiff. Although the court permitted the plaintiff's counsel to read into evidence portions of the deposition of Robert Manning, the defendant's manager of system integrity,[3]

---

[2] General Statutes § 22a-16 provides in relevant part: "[A]ny person, partnership, corporation, association, organization or other legal entity may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business . . . for declaratory and equitable relief against . . . any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ."

[3] Manning did not attend trial, and the defendant did not object to portions of his deposition being read into evidence.

it ruled that the plaintiff could not put into evidence excerpts of the depositions of William Cook, director of project management, Kathleen Shanley, director of environmental safety and real estate, and Steve Siedzik, project manager, all of whom were employed by the defendant and present in the courtroom waiting to be called to testify. The court encouraged the plaintiff to call the defendant's employees to testify, noting that counsel would have "a lot of leeway" in questioning them and that their deposition testimony could be used to impeach their courtroom testimony. Counsel for the plaintiff elected not to call the employees because she did not want to give the defendant the opportunity to cross-examine its employees. The court also denied the plaintiff's request to read into evidence excerpts from the deposition transcript of the defendant's expert witness, James R. Newman of Pandion Systems, Inc., a firm involved in environmental science, research, communications and training, and denied the plaintiff's request to call Newman as its expert witness.

After presenting the testimony of Smith, Feral and Dwyer, and marking excerpts of the employees' deposition transcripts for identification, the plaintiff rested. The defendant immediately moved, pursuant to Practice Book § 15-8, to dismiss the action for the plaintiff's failure to make out a prima facie case "that there is no threat to public health or public safety posed by the monk parakeet nests on the electrical equipment." The court granted the motion to dismiss, stating: "Well, it's rare for this court to engage in a personal response to a case that's just been presented. But I have to say . . . that this is a unique experience for this court. And I have been on the bench since 1981. . . .

"I took this case on as I try to take every other one, and as I think every Superior Court judge that I know who takes on a delicate public issue case like this takes on, with the thought that this is a serious question that

involves a lot of the public, that affects varied interests, and people's feelings are at stake. There is the humane aspect of these poor creatures who look to us for protection and survival. And I wanted to hear what this was all about. And I will be very candid and tell you that I feel disappointed and let down by the way this case has been put on. I don't think I have any alternative, but to dismiss the action. And I dismiss the action with reluctance because I don't feel I've heard the whole story, if there is another side to this story. I haven't heard it from the plaintiff.

"And I think, at this point, I will say no more because it's . . . for appellate courts to decide if . . . I'm correct in my perception. But I do not feel that you've sustained your burden of proof. . . . [Y]our expert made no bones about the fact that most of these alternative methods, which had been mentioned, had not been tested. He . . . offered no alternatives. And I was hoping to hear from the attack on the [defendant's] people why alternatives didn't exist or . . . whatever there might be. I wasn't given the opportunity to hear that. And as counsel has pointed out, the deposition testimony is a lame excuse, or the argument over that is a lame excuse for not putting the people on. They are here. They would have been under the gun. They would have been before the court. I could have registered my response to their responses . . . evaluated their answers, maybe even had questions of my own to ask them. You chose not to do that. And I respect counsel's wishes, and decisions of a tactical nature, but you leave me with no alternative but this one. So, the case is dismissed."

The plaintiff subsequently filed a motion for articulation, asking the court to articulate thirteen points. In its articulation, the court stated, in part, that "[w]hat the court found totally lacking was any action by the defendant reasonably likely 'unreasonably to pollute,

impair or destroy the public trust in the air, water or other natural resources of the state'," quoting General Statutes § 22a-17 (a). The plaintiff has appealed from the judgment of dismissal.

I

The plaintiff claims that the court abused its discretion by (1) excluding certain deposition testimony of (a) the defendant's employees and (b) the defendant's expert witness, and (2) failing to permit the plaintiff to call the defendant's expert witness as its own witness. The plaintiff also claims that the exclusion of the evidence was harmful error. We conclude that the court properly exercised its discretion when ruling on the admission of the subject evidence.

"The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion . . . and a showing by the [appellant] of substantial prejudice or injustice." (Internal quotation marks omitted.) *Jacobs* v. *General Electric Co.*, 275 Conn. 395, 406, 880 A.2d 151 (2005).

A

We first examine the plaintiff's claim that the court abused its discretion by failing to permit it to read portions of the deposition transcripts of Cook, Shanley and Siedzik (collectively employees) into evidence. Specifically, the plaintiff claims that the court failed to abide by § 8-3 (1) (A) and (C) of the Connecticut Code

of Evidence,[4] Practice Book § 13-31 (a) (3) and *Gateway Co.* v. *DiNoia*, 232 Conn. 223, 236–42, 654 A.2d 342 (1995). We disagree.

The following facts are relevant to the plaintiff's claim. During the presentation of its evidence, the plaintiff offered into evidence the transcript of Cook's deposition as a statement of a party opponent, pursuant to § 8-3 (1) of the Connecticut Code of Evidence. The defendant's counsel objected, stating first that Cook was available to testify and, second, that Practice Book § 13-31 (a) (3) was more relevant to the admission of the proffered evidence, as Cook had never been designated to speak for the defendant pursuant to Practice Book § 13-27 (h).[5] The plaintiff argued that, under Practice Book § 13-31 (a) (3), the availability of the witness was immaterial and that under *Gateway Co.* v. *DiNoia*, supra, 232 Conn. 223, statements of a party opponent may be admitted for any reason, regardless of the witness' availability.

The court was troubled by the plaintiff's request. "What troubles me is a process by which, in the middle of the trial . . . you offer transcripts. Well, suppose . . . at this point I say, 'okay, fine, mark it.' Do we recess while I absorb the deposition testimony, and

[4] Section 8-3 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . . (1) [a] statement that is being offered against a party and is (A) the party's own statement, in either an individual or representative capacity . . . (C) a statement by a person authorized by the party to make a statement concerning the subject . . . ."

[5] Practice Book § 13-27 (h) provides in relevant part: "A party may in the notice and in the subpoena name as the deponent a public or private corporation . . . and designate with reasonable particularity the matters on which examination is requested. The organization . . . so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. The persons so designated shall testify as to matters known or reasonably available to the organization. . . ."

then we do the same thing for the next . . . four depositions? And . . . when is the court enlightened as to what the claim is that's contained in these depositions that you are relying on? . . . I mean you . . . expect me to comb and say, 'oh, this is good, this is bad, or this is maybe.' . . . This is [a] very unusual tactic." The defendant objected to the plaintiff's putting the transcripts into evidence because there was no way for it to object to deposition testimony that might not be admissible at trial. The court agreed with the defendant and expressed further concern about the amount of time it would take to sift through the deposition and deal with objections from opposing counsel.

The plaintiff's counsel again argued that the depositions were admissible pursuant to *Gateway Co.* The court disagreed with the plaintiff's interpretation of the case and ruled that the transcript of Cook's deposition testimony was not admissible. The court noted, however, that the plaintiff could use the deposition testimony for impeachment purposes. The plaintiff also offered the deposition transcripts of Shanley, Siedzik and Newman as exhibits, but the court ruled that the transcripts were not admissible. The defendant agreed to produce its employees and expert witnesses to testify.

On the next scheduled day of trial, the plaintiff's counsel announced that, for tactical reasons, she would not call the employees, who were then present in the courtroom, but asked the court to admit excerpts from the transcripts of their deposition testimony into evidence, arguing that the excerpts were statements of a party opponent. The defendant objected and asked the court to abide by its previous ruling that the deposition testimony of the employees was not admissible. The court sustained the defendant's objection and clarified its ruling at the request of the plaintiff's counsel, to wit: "I think the Practice Book dictates the court's position.

I think the court has discretion under certain circumstances to circumvent or sidestep, as the case may be, adherence, strict adherence to the rule. This is not one of those situations, as far as I can tell, first of all, because we have the parties[6] present. And the very nature of the dispute is such that credibility—from what I've heard so far, at least, credibility could very well be an issue in the case. And hearing from the witnesses would be something that the trier should be exposed to. So, I'm aware of the Practice Book restriction. I would consider relaxing it but not under these circumstances."

On appeal, the plaintiff has argued that § 8-3 of the Connecticut Code of Evidence, Practice Book § 13-31 (a) (3) and *Gateway Co.* v. *DiNoia,* supra, 232 Conn. 236–42, preclude the court's exercise of discretion regarding the admission of the employees' deposition testimony into evidence. The plaintiff's argument is not persuasive because *Gateway Co.* holds that the "trial court has discretion to admit or exclude deposition testimony offered as evidence"; id., 239; under the rules of practice. Moreover, the court's ruling with respect to the subject deposition testimony is in keeping with our rules of evidence and practice.

In *Gateway Co.*, Lena DiNoia was a defendant in a breach of contract action. Id., 225. To prove agency, the plaintiff sought to put portions of DiNoia's deposition testimony into evidence pursuant to Practice Book § 248 (c),[7] which is now codified at § 13-31 (a) (3).[8] Id.,

---

[6] We believe the court misspoke and meant to say "witnesses," as the defendant's employees are not parties to this action.

[7] "Practice Book § 248 (c) provides: The deposition of a party or of anyone who at the time of the taking of the deposition was an officer, director, or managing agent or employee or a person designated under Sec. 244 (g) to testify on behalf of a public or private corporation, partnership or association or governmental agency which is a party may be used by an adverse party for any purpose." (Internal quotation marks omitted.) *Gateway Co.* v. *DiNoia,* supra, 232 Conn. 228 n.4.

[8] Practice Book § 13-31 (a) provides in relevant part: "At the trial of a civil action . . . any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were there present and

236. The trial court in that case "determined, however, that because the plaintiffs had failed to show that DiNoia was unavailable to testify at trial as required by Practice Book § 248 (d),[9] her deposition testimony could not be admitted into evidence." Id., 228. Our Supreme Court disagreed that Practice Book § 248 (d) controlled, concluding rather that the circumstances were governed by Practice Book § 248 (c); id., 239; which is now Practice Book § 13-31 (a) (3).

Our Supreme Court reversed the trial court explaining that "the trial court has discretion to admit or exclude deposition testimony offered as evidence under § 248. . . . While it is normally true that this court will refrain from interfering with a trial court's exercise of discretion . . . this presupposes that the trial court did in fact exercise its discretion. [D]iscretion imports something more than leeway in decision-making. . . . It means a legal discretion, to be exercised

_____

testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions . . .

"(3) The deposition of a party or of anyone who at the time of the taking of the deposition was an officer, director, or managing agent or employee or a person designated under Section 13-27 (h) to testify on behalf of a public or private corporation . . . which is a party may be used by an adverse party for any purpose. . . ."

[9] "Practice Book § 248 (d) provides: The deposition of a witness other than a person falling within the scope of (b) hereof, whether or not a party, may be used by any party for any purpose if the court finds: 1. that the witness is dead; 2. that the witness is at a greater distance than thirty miles from the place of trial or hearing, or is out of the state and will not return before the termination of the trial or hearing, unless it appears that the absence of the witness was procured by the party offering the deposition; 3. that the witness is unable to attend or testify because of age, illness, infirmity, or imprisonment; 4. that the party offering the deposition has been unable to procure the attendance of the witness by subpoena; 5. that the parties have agreed that the deposition may be so used; 6. upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used." *Gateway Co.* v. *DiNoia*, supra, 232 Conn. 228 n.5.

in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In this case, the trial court improperly based its decision to exclude evidence on § 248 (d) and, accordingly, failed to exercise its discretion properly. We therefore reverse the trial court's determination and conclude that the admission of DiNoia's deposition testimony should have been determined by § 248 (c)." (Citations omitted; internal quotation marks omitted.) Id.

Moreover, our Supreme Court clarified the difference between Practice Book § 248 (c) and (d), now § 13-31 (a) (3) and (4). "Although § 248 (c) is analogous to the rule of evidence that permits an admission of a party opponent to be admitted as an exception to the hearsay rule, § 248 (d) broadens the rules of evidence by permitting otherwise inadmissible evidence to be admitted. . . . Because a party may not introduce its own statement under the admission of a party opponent exception . . . § 248 (d) authorizes the admission into evidence of a deposition of a nonparty or of a party's own deposition provided certain requirements are satisfied. Therefore, § 248 (c) and (d) each apply to distinct and different circumstances." (Citations omitted.) Id., 238 n.11.

In this case, Cook, Shanley and Siedzik are not parties, but employees of the defendant, and the plaintiff has not pointed to anything in the record indicating that the defendant had designated any one of them to speak for it pursuant to Practice Book § 13-27 (h). Not only did the plaintiff fail to demonstrate that the employees were unavailable to testify, but also the record demonstrates that the defendant produced them and that they were in the courtroom waiting for the plaintiff to call them to the witness stand. Under the circumstances, we conclude that the court properly exercised

its discretion by precluding the deposition transcripts of the employees from evidence.[10]

[10] On appeal, the plaintiff also claims that the discretion granted to the court to manage trials; see *Krevis* v. *Bridgeport*, 262 Conn. 813, 818–19, 817 A.2d 628 (2003); does not permit it to ignore the Connecticut Code of Evidence and the rules of practice. This claim stems from the court's articulation of its rulings with respect to the deposition transcripts of Cook, Shanley, Siedzik and Manning. The court articulated its decision as follows:

"To evaluate the court's response to the totally unexpected advisement by the plaintiff that the plaintiff was planning to rest its case after offering excerpts from the deposition testimony of [the defendant's employees], it is necessary to view this case from the bench.

"Though assigned the case on short notice, the court was aware of the dispute and the prior legal activity it generated. Having attracted wide media coverage, there was considerable public interest on each side of the controversy. This was illustrated by the number of people who gathered in the courtroom when the trial was commenced.

"The court was aware of the intense feelings the dispute had produced and approached the trial knowing there would be vigorous argument and legal issues advanced by both sides.

"Also, based on the pleadings and counsels' remarks to the court, the credibility of witnesses could well have become a vital factor in the court's deliberations.

"Consequently, the court was not receptive to the plaintiff's tactic, which would have entailed the laborious and time-consuming process of 'screening' the proffered excerpts and possibly never getting to the witnesses to hear them out.

"The witnesses were present, the deposition transcripts were available, the parties were on notice and the stage was set for a full presentation of the issues.

"The court did not relish the prospect of several days of unnecessary court activity for no pronounced reason for this process to be allowed. It would hamper and not help the court in what appeared to be a difficult case, and the matter would probably drag on for several days with additional expense to the litigants. There would be the accompanying waste of judicial system resources and an end product that was likely to be a nightmare for any appellate tribunal wading through the trial transcripts."

The court relied on *Gateway Co.* v. *DiNoia*, supra, 232 Conn. 239, and *Krevis* v. *Bridgeport*, supra, 262 Conn. 819 (deference afforded court in making case management decisions because it is in much better position to determine effect particular procedure will have on both parties), for discretionary authority to manage trial proceedings.

The court further articulated, stating: "A waste of resources for no pronounced reason, which this court was concerned about, was actually demonstrated when the plaintiff was permitted to read into the record excerpts of [Manning's] deposition testimony. After what began to resemble a Ping-Pong match, the court interceded and terminated the Manning inquiry. This was appropriate for all of the reasons outlined above, and this 'sample' illustrates the validity of the court's decision."

B

The plaintiff's next claim is that the court abused its discretion by precluding the plaintiff from (1) reading portions of the deposition transcript of the defendant's expert into evidence and (2) calling the defendant's expert as its own witness. We disagree.

On the second day of trial, the plaintiff sought to place Newman's deposition transcript into evidence as an exhibit, claiming that Newman was not available to testify because he resided out of state. The defendant objected, noting that Newman had been in court on the first day of trial but returned home until the next week when he would be called to testify in the defendant's case. Moreover, the defendant pointed out that the plaintiff had never disclosed Newman as an expert or listed him on its witness list. The court denied the plaintiff's motion to mark Newman's deposition as a full exhibit and to call him as its own expert witness.

1

The plaintiff claims that the court abused its discretion by failing to admit the deposition transcript of Newman into evidence because he was an out-of-state witness. The plaintiff relies on Practice Book § 13-31 (a) (4) (b). We conclude that the court did not abuse

On the basis of our review of the trial transcript and the court's well stated articulation, we conclude, under the circumstances presented at trial, that the court properly exercised its discretion to manage the trial proceedings by precluding the reading of deposition transcripts at trial when the witnesses were present and able to testify. See also *West Haven Lumber Co.* v. *Sentry Construction Corp.*, 117 Conn. App. 465, 469, 979 A.2d 591 ("The trial court has a responsibility to avoid unnecessary interruptions, to maintain the orderly procedure of the court docket, and to prevent any interferences with the fair administration of justice. . . . In addition, matters involving judicial economy, docket management [and control of] courtroom proceedings . . . are particularly within the province of a trial court." [Internal quotation marks omitted.]), cert. denied, 294 Conn. 919, 984 A.2d 70 (2009).

its discretion by precluding Newman's deposition transcript from evidence.

Practice Book § 13-31 (a) (4) provides in relevant part: "The deposition of a witness . . . whether or not a party, may be used by any party for any purpose if the judicial authority finds . . . (B) that the witness is . . . out of the state and will not return before the termination of the trial . . . ." In its articulation on this claim, the court stated that it "denied the use of [Newman's] deposition transcript because it was not shown by the plaintiff that . . . Newman was unavailable. The defendant had indicated [that] this witness was available for the first day of trial. It wasn't until the second day that the plaintiff indicated it planned to call him as a witness. The court denied the plaintiff's request to call . . . Newman because it was untimely—in the middle of the trial—and the defendant claimed surprise. At the very least, the defendant would have been entitled to a delay to meet with its own expert and prepare for his testimony, were the motion to be granted. Of course, as with all of the potential witnesses, Newman would have been made available to testify had the plaintiff not chosen to rest its case when the court refused to let the case proceed via deposition excerpts only." We conclude that the court properly denied the use of Newman's deposition testimony because the plaintiff failed to demonstrate that he was unavailable.

2

The plaintiff claims that the court improperly barred it from calling the defendant's expert witness as its own expert. We disagree.

In support of its claim, the plaintiff relies on *Lane* v. *Stewart*, 46 Conn. App. 172, 176–77, 698 A.2d 929, cert. denied, 243 Conn. 940, 702 A.2d 645 (1997). In *Lane*, a personal injury action, the defendant retained and

disclosed an expert witness who was deposed by the plaintiffs. Id., 175. Thereafter, the defendant, for tactical reasons, decided not to call its expert at trial and sought to quash the subpoena duces tecum served on its expert by the plaintiffs. Id. The trial court in that case granted the motion to quash, but this court held that the granting of the motion to quash was an abuse of discretion. Id., 175, 177. This court reasoned that "[b]y disclosing the witness, the defendant made it possible for the plaintiffs to discover evidence that the plaintiffs decided was beneficial to their case and should be brought before the trier of fact. To allow the defendant to prevent this witness from testifying may have deprived the trier of fact of material and relevant information that would have assisted it in reaching a decision in the case." Id., 177. That is not the situation before us in this case. The defendant intended to call Newman, and the plaintiff would have had the opportunity to cross-examine him.

In this case, the plaintiff announced in the middle of trial that it intended to call Newman as its own witness. Practice Book, 2008, § 13-4 (4) provides in relevant part: "[A]ny plaintiff expecting to call an expert witness at trial shall disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties *within a reasonable time prior to trial*. . . . If disclosure of the name of any expert expected to testify at trial is not made in accordance with this subdivision, or if an expert witness who is expected to testify is retained or specially employed after a reasonable time prior to trial, such expert shall not testify if, upon motion to preclude such testimony, the judicial authority determines that the late disclosure (A) will cause undue prejudice to the moving party; or (B) will cause undue interference with the orderly progress of trial in the case; or (C) involved

bad faith delay of disclosure by the disclosing party. . . ." (Emphasis added.) See also *Cavallaro* v. *Hospital of Saint Raphael,* 92 Conn. App. 59, 65–66, 882 A.2d 1254, cert. denied, 276 Conn. 926, 888 A.2d 93 (2005).

The plaintiff stated that it wanted to call Newman as its witness and read his deposition testimony into evidence during the middle of trial. The court stated that counsel for the defendant is "telling us that he plans to bring [Newman] in as his witness next week. . . . That will make him available for cross-examination, impeachment and everything else. If you are telling me that you'd now like to call [Newman] as your witness, we are then confronted with the late disclosure and the late request for you to—and I don't know how you are going to get him at this late date anyhow and since they are offering and will bring him next Wednesday, I think that's . . . kind of . . . playing games." In its articulation, the court stated that it had denied the plaintiff's request to call Newman because it was *untimely.* See Practice Book, 2008, § 13-4 (4).

Moreover, in response to the plaintiff's request for a clarification of the ruling, the court stated that the defendant was planning to call Newman in its case at which time the plaintiff would have an opportunity to cross-examine him. The court did not permit the plaintiff to call Newman as its expert witness due to the plaintiff's late disclosure. Counsel for the plaintiff then stated that she might not get the opportunity to cross-examine Newman if the defendant's motion for judgment was granted and that she "just wanted to cover my bases." The court responded, in part: "Counselor, this is something that I think you . . . should have thought of when you decided on these tactics. You don't try a case in this unique fashion without running some risks. And that's why you put your case on and not adopt this sudden turnabout in the normal presentation of evidence."

On the basis of the record and our rules of practice, we conclude that the court properly precluded the plaintiff from calling Newman, the defendant's expert, as its own expert during the middle of trial. The court's rulings with respect to Newman are consistent with our rules of practice and case law as set forth herein.

## C

The plaintiff's last evidentiary claim is that the court's exclusion of the deposition testimony of the defendant's employees and expert was harmful error. Because we conclude that the court did not abuse its discretion by excluding the evidence, we need not reach this claim.

## II

The plaintiff claims that the court improperly dismissed its case for failure to make out a prima facie case pursuant to Practice Book § 15-8.[11] We do not agree.

"[W]hether the plaintiff has established a prima facie case is a question of law, over which our review is plenary." (Internal quotation marks omitted.) *John H. Kolb & Sons, Inc.* v. *G & L Excavating, Inc.*, 76 Conn. App. 599, 605, 821 A.2d 774, cert. denied, 264 Conn. 919, 828 A.2d 617 (2003). Here, the court heard all of the plaintiff's evidence in a trial on the merits of the case. See *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 933 A.2d 256 (2007). "It is appropriate, therefore, for this court to consider whether the trial court correctly determined that the plaintiffs had not met their burden of proving a violation of [General Statutes] §§ 22a-16 and 22a-18. See *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 462, 844 A.2d 836 (2004) ('notwithstanding the trial court's characterization of its ruling

---

[11] Practice Book § 15-8 provides in relevant part: "If, on the trial of any issue of fact in a civil matter tried to the court, the plaintiff has produced evidence and rested, a defendant may move for judgment of dismissal, and the judicial authority may grant such motion if the plaintiff has failed to make out a prima facie case. . . ."

as a dismissal for failure to establish a prima facie case, the question before us is not whether the evidence was sufficient to present the claim to a finder of fact, but whether, having presented its case to the fact finder at trial, the plaintiff sustained its burden of proof)." *Windels* v. *Environmental Protection Commission*, supra, 290–91.[12]

In this case, the plaintiff presented the testimony of three witnesses, including an expert, and read portions of a deposition transcript of one of the defendant's employees into evidence. Our review of the transcript reveals the following testimony of the plaintiff's witnesses. According to Smith, who has taught at Southern Connecticut State University for forty years, the parakeets were introduced into Connecticut in the 1970s

---

[12] The parties disagree as to the standard by which the court should have decided the motion to dismiss. The plaintiff argued that "[t]he standard for determining whether the plaintiff has made out a prima facie case, under Practice Book § 15-8, is whether the plaintiff put forth sufficient evidence that, *if believed*, would establish a prima facie case, not whether the trier of fact believes it." (Emphasis in original.) *Moss* v. *Foster*, 96 Conn. App. 369, 378, 900 A.2d 548 (2006). The defendant, however, argued that the issue in this case is not whether the plaintiff made out a prima facie case, but whether it sustained its burden of proof, citing *Windels* v. *Environmental Protection Commission*, supra, 284 Conn. 290, and *Cadle Co.* v. *D'Addario*, supra, 268 Conn. 462.

We need not determine whether the court, in this instance, predicated its decision on prima facie evidence or burden of proof. When it ruled orally in response to the defendant's Practice Book § 15-8 motion, the court made clear that the plaintiff had failed to produce the kind of evidence necessary for the court to consider the allegations of the complaint. The court, however, used the term burden of proof. Even if we assume, without deciding, that the court applied an improper standard by weighing the evidence when ruling on the defendant's motion to dismiss, the error was harmless. The merits of the plaintiff's case were tried to the court, which was the trier of fact, and it was within the province of the court to *sua sponte* dismiss the case on the merits. See *Berchtold* v. *Maggi*, 191 Conn. 266, 272, 464 A.2d 1 (1983) ("legally consistent for the trial court to determine that the plaintiff had established a prima facie case justifying a denial of the defendants' motions to dismiss, and then to render judgment in favor of the defendants even though they put on no evidence"); see also *Windels* v. *Environmental Protection Commission*, supra, 284 Conn. 290–91.

and have become an integral component of the ecosystem they inhabit, both urban and suburban. They are integral components of the ecosystem because they obtain resources, food and the means to construct nests from the environment. The parakeets alert other species to the presence of predators. Smith based his testimony on his observations of the parakeets and the observations of his students. The parakeets are most likely herbivores, but on occasion they may eat an insect.

According to Smith, monk parakeets are the only species of parrots, parakeets, paralets and lorikeets that build a stick nest. The number of parakeets in a nest can range from a single pair to seven pairs. A nest occupied by a single pair of birds ranges in size from one and one-half feet in diameter to two to three feet high. The largest nest Smith has seen in Connecticut was about three feet in diameter and five or six feet in height. Large nests can weigh as much as a ton. There is, however, no typical nest size. During breeding season, other species of birds use the parakeets' nests as nesting structures or as a source of nesting material to build their own nests elsewhere. Smith testified that some people enjoy watching the colorful parakeets.

The parties stipulated that the defendant captured between 179 and 189 parakeets in 2005 and 2006 and turned them over to the United States Department of Agriculture. On the basis of that stipulation, Smith opined that the capture of parakeets resulted in an overall reduction of the parakeet population in the coastal region of Connecticut.[13] He also opined, on the basis of "common sense," that the parakeet population is impaired by the defendant's capture program because 189 parakeets were "slaughter[ed]" and the remainder

---

[13] On cross-examination, Smith acknowledged that the defendant's capture program only concerned parakeets on electrical equipment. It did not involve parakeets nesting in trees or other objects in nature.

of the population was reduced by some percentage, thereby reducing its ability to nest and reproduce. Smith did not know the size of the parakeet population prior to the capture or its size thereafter.

According to Smith, when the parakeets' nests are removed, depending on the stress associated with the nest removal program, the parakeets band together and immediately build a new nest because the nest is the center of the colony, its social and living structure and, thus, is necessary for the parakeets' survival. The parakeets tend to build new nests on the same structures where the nests that were removed were located. Smith suggested that alternative nesting platforms should be erected so that parakeets will not renest on power lines and poles. To erect a nesting platform, land must be available for that purpose. The nesting platforms cost approximately $100 to construct. Smith conceded that he was not an expert on the construction or design of the alternative nesting platforms.[14]

Smith suggested alternatives to capturing parakeets: placing parakeet effigies on sites where nests have been removed to deter renesting, repeatedly removing nests within a short period of time and covering transformers with sleeves.[15] Smith also testified that "a large proportion of the population that nested on poles, once the nests were removed, within a few days and certainly within a few weeks, they were back renesting on the poles."

On cross-examination, Smith testified that he has never studied the effects of parakeet nests on the electrical system but acknowledged that the material parakeets use to construct their nests is flammable and that

---

[14] Smith identified Marc Johnson as the expert on alternative platforms.

[15] In response to an objection from the defendant's counsel, the court allowed Smith to testify about possible alternatives pending further evidence. The court stated, however, that if the case were being tried to a jury, the testimony would have to be stricken, as it did not meet the legal standard for opinion testimony. The court noted that Smith "admits to some deficiencies in his ability to answer [questions from the plaintiff's counsel]."

putting flammable material on a high voltage electrical wire can have adverse effects on worker safety. According to Smith, 90 percent of parakeets will renest on the same structure where their former nest was located due to biological imprinting. Smith considers the killing of parakeets to be an unreasonable impairment of the natural resources in the state and considers it an acceptable means of controlling the parakeets only if there are no alternatives. Smith had no opinion as to whether capturing parakeets by itself was an unreasonable impairment of the natural resources of the state.[16] In his opinion, taking down nests is a feasible and prudent alternative. He testified that other methods of dealing with the nests have not been tested adequately. He was not aware of studies regarding the success of repeated nest removal on imprinting or the interval of removal required to affect imprinting.

Smith did not know the cost of removing a parakeet nest, and he has not considered the cost of acquiring land and building alternative nesting platforms for parakeets whose nests have been removed. He agreed that, to date and with known methods, capturing parakeets and removing their nests is more successful than merely removing the nests to control the building of nests on the defendant's equipment. He considers capturing the parakeets to be "uncompassionate," unimaginative and without regard for the urban wildlife habitat.

Feral, the plaintiff's president, testified that the plaintiff was founded in 1957 as an international animal advocacy group and has approximately 5000 household members. In November, 2005, Feral alerted the plaintiff's membership that the defendant was capturing the

---

[16] At that point in the defendant's cross-examination, counsel quoted from the transcript of Smith's deposition where he testified that capturing parakeets nesting on utility poles, knocking down their nests and handing them over to another entity was not an unreasonable destruction or unreasonable impairment.

parakeets and that the birds subsequently were killed. Two hundred thirty-six of the plaintiff's members voiced opposition to the defendant's plan to eradicate the parakeets by posting comments on the plaintiff's Internet site. Feral telephoned the defendant's headquarters and spoke with Al Carbone, who explained that the eradication program was a public safety issue.

According to Feral, the plaintiff paid for the materials that were used to construct alternative nesting platforms for the parakeets.[17] Marc Johnson, a resident of Massachusetts, owns a parrot sanctuary and has demonstrated to the plaintiff's members how to construct alternative nesting platforms. On cross-examination, Feral testified that she has no scientific background and no expertise in electrical equipment or public health or safety.

The portions of Manning's deposition that were entered into evidence[18] reveal that he was employed by the defendant in 1988 and was the defendant's manager of system integrity. He first became aware of problems involving the parakeets and the defendant's delivery equipment in 2001 to 2002. In 2003, the defendant removed parakeet nests to perform maintenance, if nests were causing power outages or posed an imminent threat to hardware. The defendant also removed nests at the request of customers and to perform construction. Prior to 2005, the defendant most likely removed fewer than twenty nests. The defendant removed parakeets' nests for the public health and safety to avoid a power outage or fire. Since the 2005-2006 capture and nest removal, the defendant has observed and documented nest rebuilding where nests were removed. According to the defendant's 2007

---

[17] Feral testified that each platform cost about $50 to construct. The total paid by the plaintiff was $578.55.

[18] The plaintiff's counsel read the excerpts into the record.

annual report, the number of power outages attributable to birds and animals more than doubled from 2005 to 2006, due mostly to squirrels. Manning testified that the increase did not mark a trend because the number of such outages between 2002 and 2006 had gone down. In dealing with outages, the defendant determines whether the cause of the outages in certain areas is repeated, and, if so, it takes corrective action.

Counsel for the defendant read into evidence other portions of Manning's deposition testimony pursuant to Practice Book § 13-31 (a) (5). According to Manning, the defendant did not attempt to control the parakeets by its capture program but to prevent nests from causing outages and impacting the public health. The defendant used the capture and remove method of dealing with the parakeets because simply removing the nests did not produce good enough results. Before implementing the capture and remove method, the defendant contacted the Florida Power and Light Company, the Connecticut department of environmental protection and the United States Department of Agriculture, and retained the services of Pandion Systems, Inc., a firm involved in environmental science, research, communications and training. The agencies the defendant consulted concluded that merely removing nests caused the parakeets to rebuild a similar or multiple nests. In Manning's opinion, the capture and removal method has provided the defendant with a better means of dealing with parakeet nests than the defendant had in the past. Moreover, the defendant's experience with nest removal alone resulted in nests being rebuilt on existing poles or adjacent utility structures. In 2005, the parakeet nest problem was worsening. Following the capture and nest removal effort, the parakeet nest problem on electrical equipment was reduced.[19]

---

[19] Counsel for the plaintiff wanted to read additional portions of Manning's deposition transcript into evidence, but the defendant objected, noting that Practice Book § 13-31 (a) (5) does not provide for such a procedure. The

Donna Dwyer, a special education paraprofessional in the Waterbury school system, testified on behalf of the plaintiff. She has observed the parakeets in Connecticut, New York and New Jersey for fifteen years and has participated in the construction of alternative nesting platforms that were erected on land voluntarily made available for that purpose. Experience with the alternative platforms has demonstrated that, in areas where alternative platforms have been erected after parakeet nests were removed, the alternative platforms utilized by the parakeets to rebuild were those in closest proximity to the location of the original nest. In West Haven, two of the fourteen nesting platforms that were erected were used by the parakeets. Dwyer testified that on May 1, 2008, the defendant removed parakeet nests on electrical equipment on Ocean Avenue in West Haven. On May 18, 2008, Dwyer observed four or five nests on electrical lines on Ocean Avenue opposite an artificial nesting platform.

When the plaintiff rested, the defendant moved pursuant to Practice Book § 15-8 to dismiss the matter for the plaintiff's failure to make out a prima facie case. The court granted the motion stating, in part, "I dismiss the action with reluctance because I don't feel I've heard the whole story. If there is another side to this story, I haven't heard it from the plaintiff. . . . But I do not feel that you've sustained your burden of proof. Your expert made no bones about the fact that most of these alternative methods, which had been mentioned, had not been tested. He offered no alternatives. And I was hoping to hear from the attack on the [defendant's] people why alternatives didn't exist or whatever there might be. I wasn't given the opportunity to hear that."

court noted that reading the deposition into the record procedurally is not the same as examining a witness on the witness stand. In its articulation, the court stated that the procedure the plaintiff wanted to pursue was a waste of judicial resources, noting that "[a]fter what began to resemble a Ping-Pong match, the court interceded and terminated the Manning inquiry."

The plaintiff filed a motion for articulation, requesting, in part,[20] "an articulation of the trial court's judgment of dismissal for failure to meet the plaintiff's 'burden of proof' with respect to the following: A. [t]he basis upon which the [c]ourt found that the [p]laintiff did not establish the elements of its prima facie case and which elements were not established; B. [t]he extent to which the [c]ourt concluded that [the] [p]laintiff had a burden of proof with regard to the [d]efendant's affirmative defense, which elements of that burden of proof the [p]laintiff failed to establish . . . ."

The court responded to the motion for articulation, stating, in part: "Initially, it must be noted that the plaintiff's 'Demand for relief' states . . . 1. Enter a judgment declaring that the acts and practices of the [d]efendant in failing to implement routine maintenance and enact preventing measures to prevent the nesting of [m]onk [p]arakeets upon utility poles and the gassing, killing or capturing of [m]onk parakeets violate [General Statutes] § 22a-16; 2. Issue a permanent injunction, restraining the [d]efendant from gassing, killing or capturing of [m]onk [p]arakeets . . . ."

The court continued, stating that "[t]he plaintiff's expert . . . Smith testified that while he believed there are alternatives (to nest removal), they haven't been tested or proved. An examination of his testimony contains no suggestion that the defendant's 'routine maintenance' was wanting and contributed to the nesting. [Smith] could not predict where these birds would go if the nests were removed, but conceded that 90 [percent] would return to the site of the removed nest. He also said he had no opinions about fires or loss of power but admitted the nests are flammable. It stands to reason that the court had no basis to enter the judgment

[20] The remainder of the plaintiff's requests for articulation concerned evidentiary matters.

and issue a permanent injunction as requested by the plaintiff. . . .

"The plaintiff seeks an articulation of what elements of a prima facie case the court found were not established. What the court found totally lacking was any action by the defendant reasonably likely 'unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state . . . .' [General Statutes § 22a-17 (a)]. From the plaintiff's evidence, the court found that the defendant's failure to take appropriate action *would* impact the public trust in the air, water or other natural resources. The flammable nests described by . . . Smith would appear to be unpleasant at best and a serious health and safety hazard when ablaze. Further, there was no evidence offered to support any claim that the *defendant's* actions, particularly its aggressive stance in 2005, had an adverse impact on the environment or natural resources—even if one were to accept . . . Smith's unsupported statement that these birds are a natural resource. The plaintiff offered no evidence and made no statement that the defendant's activity was likely to cause environmental harm that required the court to intervene. (See *Waterbury* v. *Washington*, 260 Conn. 506, 557, 800 A.2d 1102 [2002])." (Emphasis in original.)

Our Supreme Court has stated that "the term 'unreasonable impairment' must be evaluated through the lens of the entire statutory scheme, if any, that the legislature has created to regulate the conduct underlying the impairment." *Waterbury* v. *Washington*, supra, 260 Conn. 549. "What constitutes an unreasonable impairment for purposes of deciding whether a violation of [the act] has occurred . . . is a question of statutory construction." Id. Under the act, "[t]he plaintiff must first make a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely *unreasonably* to

. . . *impair*, or destroy the public trust in the . . . natural resources of the state . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 550. "[T]he legislature did not intend for a plaintiff to be able to establish a prima facie case under [the act] on the sole basis that the defendant's conduct was causing something more than a de minimis impairment." Id., 553. To make out a prima facie case, the plaintiff must demonstrate a "protectible natural resource . . . and that the action of the defendants would impair this resource." (Internal quotation marks omitted.) Id., 554, quoting *Manchester Environmental Coalition* v. *Stockton*, 184 Conn. 51, 58, 441 A.2d 68 (1981). "[W]hen there is an environmental legislative and regulatory scheme in place that specifically governs the conduct that the plaintiff claims constitutes an unreasonable impairment under [the act], whether the conduct is unreasonable under [the act] will depend on whether it complies with that scheme." *Waterbury* v. *Washington*, supra, 557.

On appeal, the plaintiff claims that the court improperly determined that it had failed to make out a prima facie case because it had presented no evidence from which the court could have inferred that the defendant's unilateral decision to capture and to destroy the parakeets, in addition to removing their nests, results in impairment or destruction of a natural resource that is wholly unnecessary given the defendant's long-term reliance on its more conservative practice of nest removal alone and the success of that practice.

At trial, the plaintiff identified the wild bird act; General Statutes § 26-92;[21] as providing the standard by

---

[21] General Statutes § 26-92 provides in relevant part: "No person shall catch, kill . . . or attempt to catch, kill . . . any wild bird other than a game bird . . . . No person shall take or destroy any nest or any egg of any wild . . . bird. . . . English sparrows, starlings and, when found depredating ornamental trees, agriculture crops, livestock or wildlife, or when concentrated in such numbers as to constitute a public health or public safety hazard . . . monk parakeets . . . shall not be included among the birds protected by this section. . . ."

which to judge the reasonableness of the defendant's conduct toward the parakeets.[22] The wild bird act, however, excludes the parakeets from its protection "when concentrated in such numbers as to constitute a public health or public safety hazard . . . ." General Statutes § 26-92. The court concluded that the exception imposed on the plaintiff the burden of proving that the parakeets were not concentrated in such numbers as to constitute a public health or public safety issue. The court found that the testimony of Smith and the excerpts from Manning's deposition "render[ed] that proposition impossible to adopt." The court also cited Dwyer's testimony that she had observed that after nests had been removed from Ocean Avenue on May 1, 2008, four or five nests had been rebuilt by May 17, 2008. The record supports the court's findings and conclusion that the parakeets in this instance are not protected by the wild bird act. The court found, in accordance with Smith's testimony, that the nests are flammable and cause power outages. Moreover, the plaintiff itself referred to legislative history that demonstrates that parakeets nesting on electrical equipment were excluded from the protection of the wild bird act. Representative Mary M. Mushinsky presented the bill for the wild bird act, stating: "It allows the destruction of certain birds if they are degradating crops or wildlife or when they are concentrated in such numbers as to constitute a public health or safety hazard. For example, birds building a nest in an electric transformer, or interfering with landing of aircraft. Those would be two examples."[23] 46 H.R. Proc., Pt. 14, 2003 Sess., p. 4606.

---

[22] But see part III of this opinion.

[23] Assistant commissioner of environmental protection David Leff testified before the legislature's joint standing committee on the environment, in part: "[O]n the issue of monk parakeets, this is not a death sentence for the monk parakeets. I would point out that English sparrows and starlings have long been within the jurisdiction of this statute, and they're quite plentiful. It merely makes them not a protected species, so when, as the commissioner points out, there is a particular problem, we can deal with

The evidence presented by the plaintiff supports the court's conclusion that the parakeets' nests on electrical equipment presents a public health or safety hazard and, in such instances, the birds are not protected under the wild bird act.

Given the prima facie evidence standard established in *Waterbury* v. *Washington*, supra, 260 Conn. 557, and our thorough review of the evidence, we conclude that the court properly determined that the plaintiff failed to make out a prima facie case by failing to present evidence that the defendant's acts, as alleged in the complaint, reasonably were likely "unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state . . . ." General Statutes § 22a-17 (a). The parakeets are not protected by the regulatory scheme that affords protection to wild birds when they nest on electrical equipment in such numbers as to represent a public health and safety hazard. See 46 H.R. Proc., supra, p. 4606. In its brief on appeal, the plaintiff has failed to identify admissible evidence[24] that the defendant's conduct with respect to the parakeets impaired the public trust in the natural resources of the state in that it violated a regulatory or statutory scheme or that there was a feasible and prudent alternative to the defendant's conduct. See *Waterbury* v. *Washington*, supra, 260 Conn. 560 (no feasible and prudent alternative to conduct). The plaintiff's own witnesses testified that 90 percent of the parakeets will

it." Conn. Joint Standing Committee Hearings, Environment, Pt. 1, 2003 Sess., p. 166.

[24] In its brief on appeal, the plaintiff has referred us to portions of the deposition testimony of the defendant's employees and expert to establish facts that allegedly prove that the defendant's acts are reasonably likely to unreasonably impair the natural resources of the state. The testimony in question, however, was precluded from evidence at trial. In part I of this opinion, we concluded that the court properly excluded the proffered evidence in question. In considering the plaintiff's claims on appeal, we are limited to the evidence at trial.

rebuild their nests where the one that was removed was located. The court, therefore, properly dismissed the action.

III

The plaintiff's last claim is that the court improperly relied on § 26-92, the wild bird act, as the standard for determining unreasonableness under § 22a-16. We disagree.

This claim concerns statutory construction and is a question of law to which the plenary standard of review applies. See *Saunders* v. *Firtel*, 293 Conn. 515, 525, 978 A.2d 487 (2009). "Statutes must be interpreted to give meaning to their plain language and to provide a unified body of law." *U.S. Vision, Inc.* v. *Board of Examiners for Opticians*, 15 Conn. App. 205, 214, 545 A.2d 565 (1988).

The plaintiff argues that the department of environmental protection's regulatory scheme for water flow at issue in *Washington* v. *Waterbury*, supra, 260 Conn. 558, is complex and specific, which the wild bird act is not. The plaintiff claims that the wild bird act provides no specific criteria to quantify either " 'such numbers' " or the nature and extent of the hazard that must exist before the statutory exemption applies. See footnote 21 of this opinion. The plaintiff has identified no legal support for its argument that the degree of specificity in the statute or regulatory scheme governing the conduct in question is relevant to whether the conduct complained of constitutes an unreasonable impairment under the act. See *Washington* v. *Waterbury*, supra, 557. Although the *Washington* case involved a more comprehensive regulatory scheme, that case held that courts are to look to more specific statutes to give content to the term unreasonable in § 22a-16. See footnote 2 of this opinion. The wild bird act regulates the natural resource in question, addressing the parakeets

by name. It identifies when the parakeets are exempt from its protections. The wild bird act therefore governs the defendant's conduct in question and provides the standard by which the court was to judge the evidence. We, therefore, conclude that the court properly relied on the wild bird act when it dismissed the plaintiff's cause of action.

The judgment is affirmed.

In this opinion the other judges concurred.