FORT TRUMBULL CONSERVANCY, LLC *v.* CITY OF NEW LONDON ET AL.
(AC 32556)

Gruendel, Robinson and Borden, Js.

---

Argued February 16—officially released May 1, 2012

*Scott W. Sawyer*, with whom was *Lorna Dicker*, for the appellant (plaintiff).

*Jeffrey T. Londregan*, for the appellees (defendant city of New London et al.).

*Edward B. O'Connell,* with whom, on the brief, was *Mark S. Zamarka,* for the appellee (defendant New London Development Corporation).

*Rupal Shah Palanki,* assistant attorney general, with whom, on the brief, was *George Jepsen,* attorney general, for the appellees (defendant department of economic and community development et al.).

*Opinion*

GRUENDEL, J. The plaintiff, Fort Trumbull Conservancy, LLC, appeals from the judgment of dismissal rendered by the trial court. Its principal contention is that the court improperly dismissed its declaratory and injunctive action against the defendants, the city of New London (city), the New London planning and zoning commission (commission), the New London Development Corporation (corporation), the state department of economic and community development (department) and the state office of policy and management (office). The plaintiff further claims that the court abused its discretion in denying its motions to reconsider, to reargue, to open the judgment and to submit additional evidence. We affirm the judgment of the trial court.

This action is but the latest episode in the saga of litigation between the parties. See *Fort Trumbull Conservancy, LLC* v. *Alves,* 286 Conn. 264, 943 A.2d 420 (2008); *Fort Trumbull Conservancy, LLC* v. *New London,* 282 Conn. 791, 925 A.2d 292 (2007); *Fort Trumbull Conservancy, LLC* v. *Planning & Zoning Commission,* 266 Conn. 338, 832 A.2d 611 (2003); *Fort Trumbull Conservancy, LLC* v. *New London,* 265 Conn. 423, 829 A.2d 801 (2003); *Fort Trumbull Conservancy, LLC* v. *Alves,* 262 Conn. 480, 815 A.2d 1188 (2003). The following background is relevant to this appeal. In the late 1990s, "[t]he [city], through [the corporation], established a municipal development plan for the Fort Trumbull area

of the city. The Fort Trumbull area is a ninety acre peninsula in the southeast region of [the city] bordering the Thames River. Historically, it has supported residential, commercial and industrial uses. The city formulated a municipal development plan that envisioned water enhanced and water dependent uses designed to revitalize the local economy while retaining the neighborhood's historic character. Specifically, the municipal development plan contemplated a series of office, hotel, residential and recreational facilities." *Fort Trumbull Conservancy, LLC* v. *Planning & Zoning Commission*, supra, 341–42.

"In May, 2005, the plaintiff initiated [a civil] action in the judicial district of New London . . . seeking, inter alia, a permanent injunction prohibiting the defendants from implementing the development plan. In a two count complaint, the plaintiff . . . alleged that the office's approval of the environmental impact evaluation and the city's adoption of the development plan were invalid as the result of certain procedural defects. In count one, alleging 'unreasonable likelihood of harm,' the plaintiff made numerous specific allegations concerning the negative impact that the implementation of the development plan would have on the water, land and air resources in the Fort Trumbull area. In count two, alleging 'per se environmental harm and violation of [the Connecticut Environmental Protection Act, General Statutes § 22a-14 et seq. (act)],' the plaintiff alleged that the defendants had violated a variety of state statutes and regulations and repeated its allegations of environmental harm." *Fort Trumbull Conservancy, LLC* v. *New London*, supra, 282 Conn. 798–99. The defendants thereafter filed motions to dismiss the complaint, alleging that the plaintiff lacked standing, that the case was moot and that the action had been brought in an improper venue under General Statutes § 22a-16. Id.,

799–800. The trial court granted the motions, concluding that the plaintiff lacked standing. Id., 800–801. Our Supreme Court reversed that judgment, holding that "the plaintiff has statutory standing [and] the claim is not moot." Id., 801. The court further concluded that "although the action was brought in an improper venue, it should not be dismissed on that ground, but should be transferred to the judicial district of Hartford." Id., 801–802. The court thus remanded the case to the trial court for further proceedings. Id., 820.

The plaintiff filed an amended complaint on July 17, 2009, in which it sought declaratory and injunctive relief against the defendants. That two count complaint largely resembled the earlier pleading, the gravamen of which is that implementation of the development plan—particularly the storm water management system[1] (system) installed by the corporation—has caused or is reasonably likely to cause pollution and impairment to the environment.[2] A court trial commenced on October 6, 2009, with the presentation of the plaintiff's case-in-chief. The plaintiff introduced twenty-five exhibits into

---

[1] At trial, the court heard testimony that "[a] storm water management system consists of all the various components of . . . the mechanism whereby storm water, either generated through rainfall primarily or snow melt, finds its way to the point of return, to an outfall into the harbor or sea, or for areas that don't have the opportunity to be located on the sea, into some other body of water."

[2] More specifically, the complaint alleges that implementation of the municipal development plan "will generate additional vehicular traffic and other vehicular related activities [that] will result in the additional deposition on the property and in the Thames River and water bodies of at least eighteen contaminants and/or pollutants including but not limited to heavy metals and [polycyclic aromatic hydrocarbons]. . . . Contaminants will enter the soil, groundwater and surface water adjacent to the Thames River and water bodies and will be transported via storm water from the property to other sensitive receptors away from the property . . . . The storm water runoff into the Thames River and water bodies is not properly and/or adequately treated to prevent and/or mitigate the heavy metals and/or [polycyclic aromatic hydrocarbons] being deposited into the Thames River and water bodies."

evidence while offering the testimony of seven fact witnesses and two expert witnesses before resting on October 13, 2009.

At that time, the defendants orally moved for a judgment of dismissal pursuant to Practice Book § 15-8 predicated on the plaintiff's failure to set forth a prima facie case.[3] The defendants specifically alleged that "no evidence that the municipal development plan is reasonably likely to cause unreasonable harm has been presented by the plaintiff." After affording the plaintiff the opportunity to be heard, the court granted the motion and rendered a judgment of dismissal. In so doing, the court explained that "[t]here were no questions asked, no opinions offered about causation. . . . [T]here was no testimony as to proximate cause and no testimony that [the experts'] conclusions were to a reasonable degree of certainty. There is no evidence before this court which would allow the court to reach the conclusion that the conduct, the actions or inactions of the defendants created an unreasonable risk to the environment. There certainly are problems with the environment in this area, but the court cannot reasonably and legally conclude that these problems were proximately caused by the actions of the defendants."

The plaintiff thereafter filed motions to reconsider, to reargue, to clarify, to open the judgment and to submit additional evidence. After conducting a hearing thereon, the court denied those motions. The plaintiff also filed a motion for articulation, which the court granted. In articulating a "fuller explanation of its reasoning" for dismissing the action, the court stated in relevant part that "in support of [its] claims, the plaintiff

---

[3] Practice Book § 15-8 provides in relevant-part: "If, on the trial of any issue of fact in a civil action tried to the court, the plaintiff has produced evidence and rested, a defendant may move for judgment of dismissal, and the judicial authority may grant such motion if the plaintiff has failed to make out a prima facie case. . . ."

called upon two expert witnesses, Dr. Peter Pellegrino and Dr. Robert DeSanto, scientists who testified about their respective studies of the water bodies in question. Each of them offered opinions that the . . . system caused environmental damage to the three water bodies. The methodology used by each witness was explored at length, both on direct examination and on cross-examination. Neither [expert] was asked if his opinions were based on reasonable probability, reasonable certainty or any other standard which resembled a probability. Nor did either witness testify that anything that any defendant did or failed to do was a proximate cause of any actual or potential environmental harm. . . . [N]either expert was asked any questions about causation, nor did either expert's testimony include any statement which could be interpreted as an opinion about proximate cause. The plaintiff therefore failed to put before the court any expert opinion that anything any defendant did was a proximate cause of any environmental damage or of any future threat of environmental damage. . . . It is very clear from the evidence presented that all three of the water bodies in question have historically been contaminated by pollutants which come from a variety of sources other than the [municipal] development [plan] area on the Fort Trumbull peninsula, which is at issue in this lawsuit. The experts took limited samples from the water and/or sediment beneath the three water bodies, and did essentially nothing which would reliably demonstrate that the contaminants which they found therein came from the [municipal development plan] area. The [water bodies] all receive storm water from sources that do not drain through the . . . system. The plaintiff provided the court with no sound basis for concluding that the . . . system is an environmental risk."

Following issuance of the court's articulation, the plaintiff filed with this court a motion for review, which

we granted. The trial court then issued a "further articulation" in which it explained its reasoning for denying the plaintiff's various postjudgment motions. This appeal followed.

I

The plaintiff claims that the court improperly dismissed its action pursuant to Practice Book § 15-8. It maintains that the court applied an incorrect legal standard and, in so doing, improperly rendered a judgment of dismissal. We disagree.

A

As a preliminary matter, we briefly address the plaintiff's assertion, raised in a footnote in its appellate brief without substantive discussion or citation of authorities, that "it was improper for the defendants to raise and the court to hear [the motion to dismiss pursuant to Practice Book § 15-8] as the defendants already began their case-in-chief. . . . [T]o allow the defendants to begin their case-in-chief and then bring [such a] motion to dismiss is contrary to [the] plain language [of Practice Book § 15-8] and, as such, should not be permitted." For two distinct reasons, that claim fails.

First, it is axiomatic that this court is "not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.) *State* v. *Monahan*, 125 Conn. App. 113, 122, 7 A.3d 404 (2010), cert. denied, 299 Conn. 926, 11 A.3d 152 (2011). The plaintiff's appellate brief neither asserts this claim in

its statement of issues nor contains any substantive analysis thereof.

Second, the plaintiff neglects to note the unique procedural history of this case, which originally was brought in the judicial district of New London and was dismissed for lack of standing. In reversing that judgment, our Supreme Court concluded that although the plaintiff possessed statutory standing, the action was brought in an improper venue. *Fort Trumbull Conservancy, LLC* v. *New London,* supra, 282 Conn. 801–802. The court nonetheless held that the plaintiff's action "should not be dismissed on that ground, but should be transferred to the judicial district of Hartford." Id., 802. It then remanded the case to the trial court for further proceedings. Id., 820.

Consistent with that remand order, the case first was transferred to the judicial district of Hartford and later to the complex litigation docket in that judicial district. Because the case concerned issues peculiar to New London and necessitated travel from that region to Hartford by witnesses, the parties agreed that the defendants on cross-examination would be allowed to go beyond the scope of direct examination of witnesses called in the plaintiff's case-in-chief. That logistical accommodation served the interest of judicial economy and was authorized by the court. Notably, the plaintiff did not object to that accommodation but, rather, indicated its agreement on the record. Moreover, the court in its articulation expressly indicated that "[i]n ruling on the defendants' motion to dismiss, the court considered only such evidence as was introduced by the plaintiff. This does not mean that the court disregarded the defendants' cross-examinations of the plaintiff's witnesses; it does mean that no evidence introduced by the defendants before the trial ended played any part in the court's decision to grant the [Practice Book] § 15-8 motion." In light of the unique circumstances of this

case, the plaintiff's acquiescence and its failure to present any authority indicating that such an accommodation was improper, we decline to further entertain the plaintiff's proposition.

## B

Turning to the merits of the plaintiff's claim, we consider the threshold matter of whether the court applied an incorrect legal standard as the plaintiff maintains. The parties' respective arguments mirror those presented in *Friends of Animals, Inc.* v. *United Illuminating Co.*, 124 Conn. App. 823, 842 n.12, 6 A.3d 1180 (2010), in which "[t]he plaintiff argued that the standard for determining whether the plaintiff has made out a prima facie case, under Practice Book § 15-8, is whether the plaintiff put forth sufficient evidence that, *if believed*, would establish a prima facie case, not whether the trier of fact believes it. . . . The defendant, however, argued that the issue in this case is not whether the plaintiff made out a prima facie case, but whether it sustained its burden of proof . . . ."[4] (Citations omitted; emphasis in original.)

In *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 844 A.2d 836 (2004), our Supreme Court rejected the argument now advanced by the plaintiff. It explained that, in arguing that the trial court had improperly failed to interpret its evidence in the light most favorable to the plaintiff drawing every reasonable inference in its favor, "[t]he plaintiff fails to recognize . . . these principles

[4] Like the trial court in *Friends of Animals, Inc.* v. *United Illuminating Co.*, supra, 124 Conn. App. 842 n.12, the court in ruling on the defendants' motion to dismiss here repeatedly stated that the plaintiff had failed to meet its burden of proof. In its initial articulation, the court referenced the plaintiff's "failure of proof" and the "serious problems with the plaintiff's proof." The court similarly stated, in its further articulation, that "the plaintiff's evidence was not sufficient to sustain [its] burden of proof," while also indicating that the "plaintiff presented insufficient evidence to make a prima facie case."

apply only in cases where the court's dismissal prevents the plaintiff from presenting his case to the fact finder for consideration on the merits. . . . In such cases, this court considers only whether there was sufficient evidence to allow the fact finder to consider the claim. In the present case, the trial court was the fact finder. Thus, notwithstanding the trial court's characterization of its ruling as a dismissal for failure to establish a prima facie case, the question before us is not whether the evidence was sufficient to present the claim to a finder of fact, but whether, having presented its case to the fact finder at trial, the plaintiff sustained its burden of proof. In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . It is within the province of the trial court, as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Citations omitted; internal quotation marks omitted.) Id., 462. Accordingly, in such instances a trial court confronted with a motion to dismiss for failure to establish a prima facie case is permitted to conclude "that the plaintiff did not sustain its burden of proof." Id.; see also *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 290–91, 933 A.2d 256 (2007); *Sonepar Distribution New England, Inc.* v. *T & T Electrical Contractor's, Inc.*, 133 Conn. App. 752, 758–59, 37 A.3d 789 (2012); *Friends of Animals, Inc.* v. *United Illuminating Co.*, supra, 124 Conn. App. 842 n.12. The trial court, therefore, did not apply an incorrect legal standard to the plaintiff's claims.

C

We next address the plaintiff's related argument that the court applied an improper measure of the plaintiff's statutory burden. That claim is unavailing.

The plaintiff brought this action under the act pursuant to General Statutes § 22a-16.[5] Our Supreme Court has explained that "General Statutes § 22a-17 sets the hurdles one must overcome in order to satisfy the burden of proof requirements set under [the act]." *Waterbury* v. *Washington*, 260 Conn. 506, 550, 800 A.2d 1102 (2002). Section 22a-17 provides in relevant part that the plaintiff bears the burden of establishing "that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state . . . ."

Because a plaintiff must prove conduct on the part of the defendants that either has caused or is reasonably likely to cause unreasonable pollution, impairment or destruction of natural resources, proof of causation is elemental to such a claim. See, e.g., *Waterbury* v. *Washington*, supra, 260 Conn. 553 ("the legislature did not intend for a plaintiff to be able to establish a prima facie case under [the act] on the sole basis that the defendant's conduct was *causing* something more than a de minimis impairment" [emphasis added]); *Manchester Environmental Coalition* v. *Stockton*, 184 Conn. 51, 60 n.11, 441 A.2d 68 (1981) (in meeting burden under § 22a-17, air pollution in state could be considered "in combination with air pollution *caused* by the defendants' project" [emphasis added]). The parties agree

[5] General Statutes § 22a-16 provides in relevant part: "[A]ny person, partnership, corporation, association, organization or other legal entity may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business, except that where the state is the defendant, such action shall be brought in the judicial district of Hartford, for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ."

that the plaintiff is required to submit proof of causation by the conduct of the defendants.[6] They disagree as to precisely what such proof entails.

Distilled to its essence, the plaintiff's position is that the requisite proof is minimal. As it states in its appellate brief, the "[p]laintiff is under no obligation to show what is going into the . . . system or even that actual pollution is coming out. Just that it is reasonably likely unreasonable pollution is exiting or will exit the system." The plaintiff further posits that "[i]t is irrelevant to [the act] that the pollution is also caused in part . . . by storm water flowing from areas outside the [area]." As we understand it, the plaintiff's position is that its sole burden is to demonstrate that a natural resource of the state has been, or likely will be, polluted in the area around the system.[7]

In response, the defendants submit that the plaintiff's position "smacks of strict liability [in which] an injured party is allowed to recover damages from the party causing the harm without requiring proof of the latter's negligence or fault." We generally agree, although we note that our law requires proof of causation, not proof of negligence. Strict liability plainly is not contemplated under the act. Section 22a-17 (a) expressly permits a defendant to submit evidence to rebut the plaintiff's

[6] When the defendants orally moved for a judgment of dismissal after the plaintiff had rested its case-in-chief, the court provided the plaintiff the opportunity to present argument on that motion. At the conclusion of the plaintiff's argument, the following colloquy transpired:

"The Court: What is the burden here?

"[The Plaintiff's Counsel]: The burden, as I understand it here, is we have to show that there is a reasonable likelihood of unreasonable harm to . . . one of Connecticut's resources by a fair preponderance of the evidence.

"The Court: So, in other words, you have to establish that something the defendants are doing or have failed to do has proximately caused this unreasonable risk of harm to the environment?

"[The Plaintiff's Counsel]: Yes, sir."

[7] We note that the plaintiff, in its reply brief, specifically states that "all the plaintiff needs to show is a reasonable likelihood of unreasonable pollution."

prima facie case.[8] To paraphrase *Waterbury* v. *Washington*, supra, 260 Conn. 551, under the plaintiff's novel position, "the *only* evidence a defendant would be able to offer to rebut a prima facie case would be evidence that there was *no* pollution, impairment or destruction of the natural resource." (Emphasis in original.) That position is contrary to the plain language of § 22a-17 (a).

Moreover, in interpreting § 22a-17, our Supreme Court has held that "the legislature did not intend for a plaintiff to be able to establish a prima facie case under [the act] on the sole basis that the defendant's conduct was causing something more than a de minimis impairment." Id., 553. The proper standard requires a plaintiff to "establish that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely *unreasonably* to pollute . . . the public trust in the . . . water of the state."[9] (Emphasis

[8] General Statutes § 22a-17 (a) provides: "When the plaintiff in any such action has made a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also prove, by way of an affirmative defense, that, considering all relevant surrounding circumstances and factors, there is no feasible and prudent alternative to the defendant's conduct and that such conduct is consistent with the reasonable requirements of the public health, safety and welfare. Except as to the aforesaid affirmative defense, nothing in this section shall be construed to affect the principles of burden of proof and weight of the evidence generally applicable in civil actions."

[9] As the Supreme Court noted, "a claim under [the act] that conduct causes unreasonable pollution is not the same as a claim that conduct fails to comply with the requirements of other environmental statutes. To illustrate the point, the fact that conduct may be permitted under the relevant environmental statute does not preclude a claim that the activity causes unreasonable pollution under [the act], as when the alleged pollution exceeds the amount approved in the permit. Conversely, a claim that conduct is not properly authorized does not necessarily establish that the conduct causes unreasonable pollution under [the act]." *Connecticut Coalition Against Millstone* v. *Rocque*, 267 Conn. 116, 140–41, 836 A.2d 414 (2003). When the claim is that "there is an environmental legislative and regulatory scheme in place that specifically governs the conduct that the plaintiff claims consti-

added; internal quotation marks omitted.) *Keeney* v. *Old Saybrook,* 237 Conn. 135, 161, 676 A.2d 795 (1996). That is the standard that the trial court applied in the present case when it concluded that "[t]here is no evidence before this court which would allow the court to reach the conclusion that the conduct, the actions or inactions of the defendants, created an unreasonable risk to the environment." As the court aptly observed in the further articulation of its judgment, "this court is aware of no relaxed burden of proof, in environmental cases, which would have permitted the plaintiff to win the case without [evidence] that the defendants' alleged actions probably caused the alleged pollution or unreasonable risk of pollution, or that the defendants' alleged actions were a proximate cause thereof." We concur with that assessment and conclude that the plaintiff cannot meet its burden simply by demonstrating that a natural resource of the state has been, or likely will be, polluted in the area around the municipal development plan. Rather, the plaintiff must prove that the conduct of the defendants, alone or in combination with others, very likely caused not merely a de minimis pollution, impairment or destruction of a natural resource, but an unreasonable one.

## D

With that statutory burden in mind, we focus our attention on the evidence submitted by the plaintiff in support of its claim that the conduct of the defendants "has, or is reasonably likely unreasonably to pollute, impair or destroy the public trust in the air, water or

tutes [unreasonable pollution] under [the act], whether the conduct is unreasonable . . . will depend on whether it complies with that scheme." *Waterbury* v. *Washington,* supra, 260 Conn. 557. The claim in the present case is simply that the conduct of the defendants caused unreasonable pollution.

other natural resources of the state . . . ."[10] General
Statutes § 22a-17. In the present case, the plaintiff sub-
mitted the expert testimony of Pellegrino and DeSanto
to meet its burden of proof.[11]

The plaintiff's first expert was Pellegrino, a former
professor of biology, who examined the benthic infau-
nal communities, comprised of invertebrates such as
worms, snails, clams and crustaceans, in the water bod-
ies near the system outfalls. Pellegrino explained that

---

[10] Although the plaintiff's complaint also alleges various defects in the
drafting and adoption of the municipal development plan and the related Fort
Trumbull environmental impact evaluation, the plaintiff at trial presented no
evidence to support those allegations. Prior to trial, the defendants filed
motions in limine to preclude evidence of such procedural claims, arguing
that they were beyond the scope of § 22a-16. See *Fort Trumbull Conser-
vancy, LLC* v. *New London,* supra, 282 Conn. 808 ("the mere allegation
that a defendant has failed to comply with certain technical or procedural
requirements of a statute imposing environmental standards does not, in
and of itself, give rise to a colorable claim of unreasonable pollution under
the act"). At that time, the court indicated that it would deal with the issue
as it arose during the trial. At trial, the defendants on multiple occasions
renewed their objection on that basis. Each time, the plaintiff elected to
move on to a different line of questioning, thereby abandoning those claims.
The defendants in their respective briefs argued that the plaintiff abandoned
its procedural claims at trial, and the plaintiff in its reply brief does not
contest that assertion. Accordingly, we confine our review to the plaintiff's
principal claim.

[11] We reject the plaintiff's ancillary argument that the court improperly
concluded that expert testimony was required in this particular case to meet
the burden of proof under § 22a-17. The specific allegations at issue pertained
to the "deposition on the property and in the Thames River and water bodies
of at least eighteen contaminants and/or pollutants including but not limited
to heavy metals and [polycyclic aromatic hydrocarbons that would] enter
the soil, groundwater and surface water adjacent to the Thames River and
water bodies and will be transported via storm water from the property to
other sensitive receptors away from the property." The essence of the plain-
tiff's claim is that the hydrodynamic device, known as a Vortechnic storm
water system, installed by the corporation "is not properly and/or adequately
treated to prevent and/or mitigate the heavy metals and/or [polycyclic aro-
matic hydrocarbons] being deposited into the Thames River and water
bodies." As the court rightly concluded, those claims involved issues beyond
the field of ordinary knowledge and experience of the trier of fact, necessitat-
ing expert testimony thereon. See *Isham* v. *Isham,* 292 Conn. 170, 186, 972
A.2d 228 (2009).

he took samples of bottom sediments from Bentley Creek, Shaw's Cove and the Thames River on October 10, 2004. On the basis of subsequent analysis of those samples, Pellegrino concluded that those water bodies could be characterized as degraded, which he defined as "[d]egraded compared to an uncontaminated, relatively pristine habitat."

Pellegrino testified that his "goal was simply to establish existing conditions." Accordingly, he did not examine or compare treated and untreated system outfalls.[12] Asked on direct examination whether he had "an opinion with regard to the contaminant levels as they relate to Bentley Creek and where they're coming from," Pellegrino answered that "it really wasn't my task to determine the source of the stress" before speculating that the "obvious one that I'm familiar with is [the] storm water outfall in . . . Bentley Creek. Other than that, I . . . don't know. There could be other sources, but I don't know of them." As to other possible sources of stress, Pellegrino opined that boat traffic "absolutely" could affect test results and acknowledged that there were a number of marinas in the area, including ones in Shaw's Cove and at the mouth of Bentley Creek. Although rainstorms too could provide a source of stress, Pellegrino stated that he did not know whether there was a rainstorm on the date of his testing or the days preceding it. He also acknowledged that Bentley Creek formerly was the site of a junkyard and that the water bodies in question were tidal areas, into which pollutants may wash from elsewhere. Nevertheless, Pellegrino's testimony and written report did not account for any of those possible sources of stress. Pellegrino further testified that Bentley Creek already was "highly

---

[12] The system features a hydrodynamic device known as a Vortechnic storm water system. In his testimony, Pellegrino twice indicated that "I really don't understand what a vortex is anyway."

contaminated" at the time that the municipal development plan was adopted. Notably, Pellegrino opined that, at the time of trial, Bentley Creek was "less degraded" than it was when the municipal development plan was adopted.

Pellegrino's own testimony indicates that he offered no evidence of causation, nor was that his task. As he testified, "my goal or my task, let's say, was to describe the biological conditions, the overall ecological health of Bentley Creek and Shaw's Cove and that [testing location] in the Thames River."

The plaintiff's second expert, DeSanto, was an environmental consultant who offered testimony and a corresponding report on the projected environmental impact of the municipal development plan. His testimony, over the course of two days and more than one hundred and forty pages of transcripts, concerned both test results of sediment samples from Bentley Creek, Shaw's Cove and the Thames River, and his projections on the effect of vehicular traffic. DeSanto's testimony and related report pertained to a study area of 312 acres, despite the fact that the municipal development plan area is comprised of only 45 acres.

DeSanto testified that his task was to determine the level of contaminants in the storm water from the municipal development plan area. Yet, absent from his lengthy expert testimony is any discussion of evidence that contaminants existed in the storm water from the system at issue. To be certain, DeSanto testified about test results from bottom sediment samples taken by Pellegrino on October 10, 2004, and samples he himself took on one day in July, 2009. It is undisputed, as the court found, that those sediment samples confirmed the existence of pollution in the water bodies. Under the burden of proof set forth in § 22a-17, such evidence is insufficient, as a plaintiff further must demonstrate

that the conduct of the defendants, alone or in combination with others, caused unreasonable pollution therein.

The problems in the methodology employed by DeSanto are numerous. As already noted, his study area included more than 200 additional acres beyond that of the municipal development plan area. Like Pellegrino, DeSanto never tested the storm water entering the system, despite the fact that such testing, in his opinion, is "extremely useful." He further testified that he did not test the storm water exiting the system. On a more basic level, DeSanto testified that, in reaching his conclusions, he did not rely on any water quality test results from any of the water bodies in question. DeSanto admitted that there are storm water watersheds within his study area that are generated by storm water which is not treated by the system, and further conceded that untreated storm water from outside the 45 acre municipal development plan area combines with the storm water treated by the system *before* being discharged into Shaw's Cove and Bentley Creek. Later in his testimony, DeSanto stated that he was "certain" that the municipal development plan area even accepted storm water flow from *outside* of his 312 acre study area.

Moreover, he testified that, apart from the system installed as part of the municipal development plan, there is an untreated outfall that runs into Shaw's Cove, which "[a]bsolutely" contributes to the state of the sediment therein. Like Pellegrino, DeSanto acknowledged that there are marinas in the area, whose boats deposit pollutants into the water bodies. DeSanto also testified that the Thames River "is an impaired water body according to the federal government and state government. . . . [F]rom its mouth to Norwich, [the river] is tainted, if you want to use that phrase."

In addition, DeSanto criticized the Vortechnic storm water system at issue, expressing his opinion that, in

light of the bottom sediment test results, the system was "a failed system. It is not working."[13] At the same time, he testified that "hydrodynamic devices [such as the Vortechnic storm water system] are a very good tool for assistance in managing storm water discharge, storm systems, and should certainly be encouraged" and opined that "[a]ny hydrodynamic device as a part of a drainage system or a storm water management system is far better than nothing." DeSanto admitted that the system installed by the corporation is an improvement over what previously existed in the area and testified that Bentley Creek at present was in better condition environmentally than it had been when the municipal development plan was adopted.

Apart from the test results of the bottom sediments, DeSanto's expert testimony was predicated on the results of his vehicular traffic projections. DeSanto conducted no traffic testing on his own but, rather, relied on traffic studies that were conducted in the 1970s,

[13] Although DeSanto opined that the system was not properly maintained, an assertion that the plaintiff advances on appeal, no evidence in support of that assertion was introduced at trial. To the contrary, the defendants represent, and the plaintiff does not dispute, that the storm water quality management plan, which the plaintiff introduced into evidence at trial, states in relevant part that the maintenance procedure contained therein was to begin once the proposed "construction has been completed" and that testing of storm water shall be done after the "completion of construction activity in parcels draining to the outfall being evaluated." In addition, John Books, executive director of the corporation, testified that the system implemented as part of the municipal development plan was so advanced that the state department of environmental protection had not yet established any testing criteria therefor. Nevertheless, Joseph Jullarine, division manager of the highway department for the New London department of public works, testified that he twice "cleaned out" the Vortechnic units since the time that the city took control of the system from the corporation in 2004. Jullarine acknowledged that although there may not be a written maintenance or cleaning policy, he regularly carried out the maintenance and repair of the system for the city. Jullarine also testified that he oversaw a process by which water samples from areas within the municipal development plan area were tested at the direction of, and in coordination with, the department of environmental protection.

which provided certain assumptions to traffic patterns in the area. Applying those assumptions, he utilized an algorithm to generate predictions of pollution from vehicular traffic in the area. As he explained: "I used this algorithm . . . to report . . . what's the predicted load of contaminants on storm water leaving a development site after the site is constructed and operated. . . . I . . . adapted that algorithm . . . by finding new numbers and making new decisions about traffic loads and length of travel and the rest that's described in my report . . . . [W]hat I did was a part of an overall study. I'm talking about storm water evaluation contamination from traffic management of that resource. So, my part in the study in using this algorithm was to quantify it. . . . [T]he algorithm, once again, I say it is an approximation based on the best numbers I could come up with to predict what the eventual outcome will be. . . . What my algorithm shows, based on the best science I could come up with, is a guideline as to identifying that traffic brings with it the essential characteristics leading to storm water contamination in this nature."

Significantly, DeSanto conceded that the analysis contained therein did not account for advances in automobile technology or heightened emission standards since the 1970s. Furthermore, his presumptions were predicated on his 312 acre study area, which included the Pfizer global research campus located outside the municipal development plan area. In his testimony, DeSanto acknowledged that the municipal development plan area constitutes only 45 of the 312 acres in his study area. He further acknowledged that he knowingly selected a study area beyond those confines that included, inter alia, the Pfizer campus. Astonishingly, he explained that inclusion by stating that "Pfizer isn't party to the legal action. Pfizer is a substantial party to the ecological action." Questioned specifically about

the study area he selected, DeSanto testified: "I don't care about jurisdictional boundaries. I'm trying to describe the natural systems and their ecology, which are blind to jurisdictional boundaries." Perhaps most importantly, DeSanto acknowledged that, to his knowledge, the methodology he employed in this case has not been adopted by any other scientist.

It is well established that "[i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . It is within the province of the trial court, as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Citation omitted; internal quotation marks omitted.) *Cadle Co.* v. *D'Addario*, supra, 268 Conn. 462; see also *Jay* v. *A & A Ventures, LLC*, 118 Conn. App. 506, 514, 984 A.2d 784 (2009) (as trier of fact, trial court free to accept or reject, in whole or in part, testimony offered by either party). In the present case, the court did not credit the testimony of DeSanto or Pellegrino, expressly indicating that their testimony likely would have been disallowed if the defendants had requested a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct 1384, 140 L. Ed. 2d 645 (1998), and describing "the problems with the methodologies . . . employed" by the plaintiff's experts as "dramatic."[14] The court further emphasized that the fundamental failing of the experts' testimony was that it lacked any credible

---

[14] In its oral ruling on October 13, 2009, the court found that "the methodology utilized [by DeSanto] was totally inadequate to allow the court to draw any conclusions to a level of reasonable certainty as to any of the claims being advanced by the plaintiff. The methodology used in the testing, the selection of testing methods, the selection of testing sites, the decision not to test the water on the way in or on the way out of the Vortechnic systems all make the court conclude that his testimony has no reasonable scientific basis."

indication that the conduct of the defendants specifi-
cally caused impairment of a natural resource, finding
that "[t]he experts took limited samples from the water
and/or sediment beneath the three water bodies and
did essentially nothing which would reliably demon-
strate that the contaminants which they found therein
came from the [municipal development plan] area."
Although it is not the place of this appellate body to
usurp the trial court's exclusive role as arbiter of credi-
bility, we concur with that assessment in light of our
careful review of the record.

Returning our attention to the proper measure of
proof under § 22a-17, we repeat that the plaintiff's bur-
den is to present evidence demonstrating that the con-
duct of the defendants, alone or in combination with
others, very likely caused not merely a de minimis pollu-
tion, impairment or destruction of a natural resource,
but an unreasonable one. The evidence submitted in
the present case by the plaintiff indicates simply that
the water bodies in question are polluted. As the trial
court properly determined, the plaintiff failed to submit
evidence establishing the requisite causal link between
that pollution and the conduct of the defendants. A
fortiori, we need not consider the question of whether
the plaintiff met its burden of proving that the conduct
of the defendants caused, or is reasonably likely to
cause, an *unreasonable* pollution, impairment or
destruction of a natural resource of the state.

II

The plaintiff also claims that the court improperly
denied its motions to reconsider, to reargue, to open
the judgment and to submit additional evidence. Such
rulings are reviewed for an abuse of discretion.[15] "When

[15] See, e.g., *Cadle Co.* v. *Clark*, 127 Conn. App. 160, 169, 12 A.3d 1091
(2011) (court's denial of motion to open judgment reviewed only for abuse
of discretion); *Korsgren* v. *Jones*, 108 Conn. App. 521, 527, 948 A.2d 358
(2008) (claim that court improperly denied motion for reargument reviewed
under abuse of discretion standard); *Shore* v. *Haverson Architecture &*

reviewing claims under an abuse of discretion standard, the unquestioned rule is that great weight is due to the action of the trial court . . . ." (Internal quotation marks omitted.) *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 274, 819 A.2d 773 (2003). Under that standard, we must "make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *Hartford Steam Boiler Inspection & Ins. Co.* v. *Underwriters at Lloyd's & Cos. Collective*, 121 Conn. App. 31, 61, 994 A.2d 262, cert. denied, 297 Conn. 918, 996 A.2d 277 (2010). "The burden falls on the party challenging the exercise of discretion to demonstrate that the disputed action constituted a clear abuse of that discretion." *Board of Selectmen* v. *Freedom of Information Commission*, 294 Conn. 438, 453, 984 A.2d 748 (2010). "[O]ur appellate decisions emphasize that an abuse of discretion leading to reversal is rare." (Internal quotation marks omitted.) *Sweeney* v. *Sweeney*, 271 Conn. 193, 212, 856 A.2d 997 (2004).

The plaintiff's claim with respect to its motion to reconsider is predicated on its contention that the court "misapplied" both the "applicable legal standard" and its burden of proof, a contention we rejected in part I B and C of this opinion. As such, we cannot say that the court abused its discretion in denying the motion to reconsider.

*Design, P.C.*, 92 Conn. App. 469, 479, 886 A.2d 837 (2005) ("standard of review regarding challenges to a court's ruling on a motion for reconsideration is abuse of discretion"), cert. denied, 277 Conn. 907, 894 A.2d 988 (2006); *Wasson* v. *Wasson*, 91 Conn. App. 149, 155, 881 A.2d 356 (whether to permit further evidence after the close of testimony is matter resting within discretion of court), cert. denied, 276 Conn. 932, 890 A.2d 574 (2005).

We likewise conclude that the plaintiff's claims with respect to its motions to reargue, to open the judgment and to submit additional evidence equally are without merit. They rest in part on the plaintiff's repeated allegation that the court misapplied the relevant standards, as well as its allegation that it "was not afforded a reasonable opportunity to be heard" on the defendants' motion for a judgment of dismissal. The October 13, 2009 transcript belies that assertion, as the court heard detailed argument from the plaintiff on the motion. As the court explained in its further articulation, "[g]ranting [the] plaintiff's motion . . . for the presentation of additional evidence—a request, in other words, for a 'do over'—would have been entirely inconsistent with judicial economy and the principles on which our system of justice is founded. We expect the parties to a civil action to appear for trial fully prepared to go forward. When a party comes to court unprepared to address important issues which it should have known would be disputed at trial and that party fails to meet its burden on those issues, the trial judge does not stop the proceedings and give the losing party time to correct the mistake. That is not how things work in our system of justice. The plaintiff has presented the court with no good reason why it should make an exception for this case . . . ." We cannot improve on that sentiment. On our exhaustive review of the record before us, we conclude that the court did not abuse its ample discretion in denying the plaintiff's various postjudgment motions.

The judgment is affirmed.

In this opinion the other judges concurred.